UNITED STATES OF AMERICA

v.

DAVID McCLOSKEY.

Criminal No. 09-225

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO APPLICATION OF THE SENTENCING GUIDELINES

Conti, Chief District Judge

## I.  Introduction

Pending before the court are several disputes with respect to the appropriate advisory guidelines sentence applicable to defendant David McCloskey ("defendant"). On August 23, 2010, the Probation Office prepared and filed a Final Presentence Investigation Report ("PIR") (ECF No. 36), which outlined the advisory sentencing guidelines range applicable to defendant. The government filed objections to the PIR (ECF No. 41), as did defendant (ECF No. 46). The government supplemented its objections (ECF No. 73), defendant responded (ECF No. 75), the government filed a further reply (ECF No. 76), and the government filed a second revised set of objections to the PIR (ECF No. 85). On March 19 and 20, 2012, the court conducted an evidentiary hearing with respect to the correct application of the sentencing guidelines. During that hearing, the court heard testimony from witnesses and admitted evidence. The government filed proposed findings of fact and conclusions of law (ECF No. 109) on February 15, 2013, and defendant filed the same (ECF No. 111) on March 20, 2013.

The parties identify six separate issues that remain to be addressed with respect to the appropriate guidelines sentencing range: (1) the amount of loss; (2) whether to apply a number of victims enhancement; (3) whether to apply a sophisticated means enhancement; (4) whether to apply a leadership role enhancement; (5) whether to apply an obstruction of justice enhancement; and (6) whether to reduce the offense

level for acceptance of responsibility. The matter now being fully briefed and ripe for disposition, the court makes the following findings of fact and conclusions of law with respect to the application of the sentencing guidelines.

## II. Findings of Fact

### A. Offense Background

1. On July 14, 2009, a federal grand jury returned a one-count indictment charging defendant with Conspiracy to Commit Wire Fraud, a violation of 18 U.S.C. § 1349. (ECF No. 1.)

2. On June 8, 2010, defendant withdrew his plea of not guilty and pleaded guilty to the offense charged at count 1 of the indictment. (ECF No. 28.) During the hearing at which defendant entered a plea of guilty, he agreed with part of the government's factual basis for the charge set forth at count 1 of the indictment and acknowledged that those factual statements he agreed with "satisf[y] the elements of wire fraud." (Change of Plea Hr'g Tr. 17–20, ECF No. 78.) The court accepted defendant's entry of a guilty plea as being knowing and voluntary. (*Id.* at 20–21.)

3. The PIR summarized the offense as follows:

   (a) Ken Cowden ("Cowden"), an unlicensed real estate appraiser, provided fraudulent appraisals to numerous mortgage brokers using the names and appraiser license numbers of licensed appraisers. (ECF No. 36, ¶ 4.) Cowden provided this fraudulent information so that individuals could qualify for mortgage loans for which they would not otherwise be approved. After the execution of a search warrant at his residence, where thousands of falsely inflated appraisals were discovered, Cowden began cooperating with investigators. One of the individuals to whom Cowden provided fraudulent appraisals was defendant, who operated a mortgage brokerage firm called First Atlantic Financial ("First Atlantic"). Information received from cooperators indicated that

defendant was aware that Cowden was not licensed and that he provided fraudulent appraisals.

(b) First Atlantic employees Erika Stanford ("Stanford") and Daniel Gillen ("Gillen") also participated in the scheme. (ECF No. 36, ¶ 4.) Gillen admitted to agents that he created false documentation to submit to lenders in support of mortgage loan applications, including fake bank account statements, W-2 forms, and paystubs. Gillen worked with defendant at Century III Home Equity prior to working for First Atlantic. Gillen indicated that defendant, his employer at First Atlantic, was aware that he created false documents to support loan applications and asked Gillen to create them for defendant's use.

(c) Defendant was interviewed by the case agent about loan files listing defendant as the loan officer and Cowden as the appraiser. (ECF No. 36, ¶ 5.) At that time, defendant gave a full confession acknowledging that he knew Cowden was not licensed and was providing fraudulent appraisals.

4. Defendant objected to portions of the PIR dealing with offense conduct and the application of sentencing enhancements. The court held an evidentiary hearing on March 19 and 20, 2012, to determine the correct application of the sentencing guidelines in this case.

### B. Hearing Testimony

5. At the evidentiary hearing, the government offered testimony from FBI Special Agent Joseph M. Bieshelt ("Special Agent Bieshelt"), who stated that investigators executed a consent search of Cowden's residence and discovered a "rack sheet," which was a handwritten list of all the requests for appraisals he was asked to do by various mortgage brokers. The rack sheet included the name of the borrower, the property, and the brokerage firm that requested the appraisal. (Evidentiary Hr'g Tr. 6, Mar. 19, 2012, ECF No. 102.) An electronic form of the rack sheet created by the FBI was admitted into evidence as Exhibit A. The total

amount of the requested appraisals on the rack sheet is approximately $323.6 million. (*Id.* at 7.) The FBI also prepared a separate electronic version of the rack sheet, admitted as Exhibit B, that included only those appraisals requested by First Atlantic, which totaled more than $33 million. (*Id.* at 8–9.)

6.  Special Agent Bieshelt testified that he interviewed Gillen as part of his investigation of mortgage fraud activities.[1] (*Id.* at 10.) Gillen worked at various mortgage brokerages that requested appraisals from Cowden, including First Atlantic and First Capital Home Equity. (*Id.* at 10–11.) Gillen was adept at creating false documents to support loan applications, including W-2 tax statements, pay stubs, bank statements, retirement account statements, and documents verifying borrowers' assets. (*Id.* at 11.) Special Agent Bieshelt testified that Gillen was employed at First Atlantic and that defendant was his boss. (*Id.* at 13.) Special Agent Bieshelt also testified that, based upon his interviews of Gillen, everyone at First Atlantic, including defendant, knew that Cowden and Gillen were not licensed to prepare appraisals. (*Id.* at 13–14.) Special Agent Bieshelt conceded that he did not know whether defendant knew that Cowden did not have a license to prepare appraisals. (*Id.* at 22.)

7.  The government called Cowden, who testified that he prepared fraudulent appraisals for First Atlantic beginning in 2001 or 2002 until May 27, 2005, when

---

1   While Special Agent Bieshelt's testimony about Gillen's statements is hearsay, the Federal Rules of Evidence do not apply in sentencing determinations. *See* U.S. Sentencing Guidelines Manual § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). The hearsay statements at sentencing must satisfy the requirements of the Due Process Clause, however, which requires "some 'minimal indicium of reliability beyond mere allegation.'" *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007) (quoting *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir. 1999)). In this case, Special Agent Bieshelt's testimony about statements made by Gillen was corroborated in large part by the testimony of Erika Stanford and Shawn Cupp. The court finds Special Agent Bieshelt's testimony to be credible and sufficiently reliable to be admissible and given weight.

the FBI searched his home. (*Id.* at 36–40.) Cowden testified that defendant knew he did not have a license. (*Id.* at 39.) Cowden also testified that defendant knew he performed appraisals under approximately six different names, and that ninety-nine percent of the time, if a certain value was requested by the brokerage firm, Cowden would perform the appraisal and would give the brokerage firm the value requested. (*Id.* at 41, 46–47.) Cowden typically overstated the value of properties appraised by approximately twenty to forty percent. (*Id.* at 48.) According to Cowden, defendant originally paid him $300 per appraisal, but increased that amount to $400 so that defendant's appraisal requests "moved to the top of the list." (*Id.* at 47.)

8. Cowden testified that he could not recall having any specific conversation with defendant about the fraudulent appraisals that he prepared, or his unlicensed status, but he reported that his fraudulent practices were "just the talk in the business." (*Id.* at 80–82.) Upon further questioning, Cowden testified that approximately sixty percent of his appraisals were overstated, while others were appropriately valued. (*Id.* at 83.)

9. The government presented testimony from Stanford, who worked at First Atlantic as a loan officer during the early 2000s. (*Id.* at 85.) Stanford testified that she, defendant, and other employees at First Atlantic all knew that Cowden and another individual, Eugene Parise, provided fraudulently inflated appraisals and that Cowden did not have a license. (*Id.* at 88, 90–92.) According to Stanford, if she or other loan officers requested an appraisal for a property with a certain value, Cowden would provide that appraisal value "every time," and that loans based upon a Cowden appraisal would close every time. (*Id.* at 90–92.) Stanford recalled an instance in which a fraudulent appraiser's license was used in which the license clearly had a new date cut and pasted over the old date. (*Id.* at 90–91.) Stanford indicated that defendant "laughed at how bad it was." (*Id.* at 118.)

10. Stanford testified that it was a common practice at First Atlantic to misrepresent borrowers' financial conditions by providing fraudulent documents in support

of loan applications, including false bank statements, 401K statements, checks, W-2 statements, and paystubs, which were typically created by Gillen. (*Id.* at 102–06.) Defendant knew about and participated in these misrepresentations by actually requesting false documents from Gillen. (*Id.*) Stanford described defendant as "running the show" at First Atlantic, including running the day-to-day activities of the office, and she noted that defendant's nickname in the office was "King." (*Id.* at 103–04, 115.) Stanford testified that defendant used cocaine and was involved in gambling. (*Id.* at 135.)

11. Stanford testified that First Atlantic typically secured a loan worth approximately eighty percent of the total value of the property. (*Id.* at 97.) With respect to the fees collected by First Atlantic and the various brokers working there, Stanford testified that the fee would be split evenly between First Atlantic and the broker. (*Id.* at 94.) Borrowers were not informed that they were paying for appraisals from unlicensed appraisers. (*Id.* at 96–98.) The standard practice at First Atlantic was to charge borrowers a fee of seven percent of the total value of the loan. (*Id.*) As part of that fee, First Atlantic collected a "yield spread premium" from the lenders, which is a fee that the lender pays to the broker for selling the borrower a loan at a higher interest rate than the lowest rate for which the borrower qualified. (*Id.* at 109–15.) First Atlantic did not disclose this fee to borrowers, although it did appear on the HUD-1 form. (*Id.* at 113–15.)

12. The government presented testimony from Ann Tonkovich, ("Tonkovich"), who corroborated earlier statements that defendant ran the day-to-day operations at First Atlantic. (*Id.* at 149.) Tonkovich was not aware that Cowden was providing fraudulent appraisals until after she left First Atlantic and gained more experience in the mortgage industry. (*Id.* at 146–49.) Tonkovich confirmed that fees were evenly split between First Atlantic and the individual loan officer. (*Id.* at 149.)

13. The government presented testimony from Shawn Cupp ("Cupp"), who was employed at First Atlantic beginning in 2001 and continuing for a period of two

years. (*Id.* at 157.) Cupp corroborated other testimony that defendant and other employees of First Atlantic knew that Cowden did not have a license to perform appraisals. (*Id.* at 159–60.) Cupp also corroborated that defendant knew that Cowden was preparing fraudulently inflated appraisals and that Gillen was preparing false documents in support of misrepresentations in loan applications. (*Id.* at 159–60, 167–70.) On cross-examination, Cupp conceded that he could not specifically recall hearing a conversation in which defendant stated that he knew Cowden did not have a real estate license. (*Id.* at 183.) Cupp noted, however, that defendant would occasionally write "Ken's World" on an appraisal, indicating that "it was beyond reality." (*Id.* at 165.) Cupp testified that defendant said on several occasions that Gillen "had a criminal mind." (*Id.* at 169.) Cupp also testified that defendant had a "tremendous" gambling addiction and spent thousands of dollars at a time on cocaine. (*Id.* at 177.) Cupp corroborated other testimony indicating that when Cowden prepared an appraisal, the loan would close almost one hundred percent of the time. (*Id.* at 164–65.) Cupp corroborated testimony that defendant ran the day-to-day operations of First Atlantic, dealt with the appraisers, did the hiring and firing, and made arrangements with lenders. (*Id.* at 170.) With respect to fees, Cupp testified that fees were split evenly between the loan officers and First Atlantic and defendant wanted to charge the highest possible fee for each loan. (*Id.* at 170–71.) Borrowers were not told that they actually qualified for a lower rate than was offered by First Atlantic. (*Id.* at 172.)

14. The government presented testimony of United States Secret Service Special Agent Daniel Fisher ("Special Agent Fisher"), who prepared a spreadsheet entered as Exhibit D, which listed appraisals prepared by Cowden for First Atlantic. (*Id.* at 192–94.) Special Agent Fisher identified those appraisals prepared by Cowden that were paid for by the borrower, based upon information learned from either the appraisal itself or the HUD-1 document associated with the loan. (*Id.*) Special Agent Fisher testified that borrowers paid for 133 appraisals prepared by Cowden for First Atlantic. (*Id.* at 194.) Special

Agent Fisher did not speak to any of the borrowers to determine whether they knew that the appraisal for their loan was fraudulent. (*Id.* at 196.) According to Exhibit D, the amount paid for those appraisals was $51,600 (116 for $400, 2 for $350, and 15 for $300). Exhibit D also indicates that three borrowers paid for more than one appraisal, for a total of 130 victims. Special Agent Fisher's testimony is creditable and corroborated by Cowden's testimony that he originally was paid $300, but later received $400 per appraisal.

15. The government presented testimony from Diane Wikert ("Wikert"), a paralegal in the United States Attorney's office, who prepared a spreadsheet with a calculation of the amount of loss caused by First Atlantic's fraudulent activities. (*Id.* at 202–04.) The spreadsheet was admitted as Exhibit E. In creating Exhibit E, Wikert took the electronic version of Cowden's rack sheet and sorted it to include only appraisal requests from First Atlantic. (*Id.* at 203.) Wikert researched which of the First Atlantic loans went through the foreclosure process, based upon publically available records. (*Id.* at 204; Exs. E-1 to E-34). For twenty of the thirty-four properties included in Exhibit E, Wikert calculated the amount of loss by adding the principal amount outstanding on the loan at the time of foreclosure to the price paid for the property at the foreclosure sale by the bank (the total amount of loss). From that total, Wickert then subtracted the total sale price after foreclosure[2] (the amount for which the bank ultimately sold the property) to arrive at the total amount of loss for each property. (*Id.* at 204–07.) In other instances, Wikert was unable to obtain a foreclosure complaint and did not know the principal amount at the time of foreclosure. (*Id.* at 208–09.) Wikert testified, however, that she obtained information from other

---

2    In two instances, Wikert knew the foreclosure sale price and the principal amount at foreclosure, but the bank had not yet sold the property after acquiring it at the foreclosure sale. For those two properties, Wikert reduced the amount of loss by the assessed value of the properties to achieve the calculated amount of loss, which she testified is a conservative method of calculating amount of loss, since typically the bank sells the property after foreclosure for less than the property's assessed value. (ECF No. 102, at 208.)

publically available sources indicating that those properties had gone through foreclosure. (*Id.* at 209.) In lieu of a foreclosure complaint, Wikert testified that she either (1) used the loan amount found on the HUD-1 form or (2) used a value that was eighty percent of the value requested by First Atlantic found on Cowden's rack sheet. (*Id.*) Based upon Wikert's calculations, the total amount of loss attributable to the fraudulent activities at First Atlantic was $3,005,077.71. (*Id.* at 211; Ex. E.)

16. Wikert separately calculated the amount of loss attributable to the payment of broker fees based upon her review of the available HUD-1 forms. (ECF No. 102, at 213–14.) The total amount of that loss was $966,262.21. (*Id.*; Ex. F.)

### C. *Motion To Withdraw Guilty Plea*

17. Defendant filed a motion to withdraw his guilty plea on May 22, 2012. (ECF No. 83.) In support of the motion to withdraw his guilty plea, defendant filed an affidavit in which he made the following sworn representations to the court: "That I have read the entirely [sic] of this motion and assert that each factual matter stated therein is true and correct to the best of my knowledge, information and belief," and "I assert that I am innocent of the offense charged in the Indictment." (*Id.* ¶¶ 2, 5.) Defendant acknowledged that his affidavit was made subject to the penalty of perjury. (*Id.*) Defendant withdrew the motion to withdraw his guilty plea at the hearing on that motion, following extensive briefing by the government (ECF No. 86) and several delays in the proceedings. (*See* ECF Nos. 89, 93, 100, 104.)

18. Defendant's knowing and voluntary admission in open court, under oath, that he committed the offense charged in the indictment in this case is directly contradicted by the statements he made under penalty of perjury in the affidavit in support of his motion to withdraw his guilty plea. Defendant's sworn statement in the affidavit was further contradicted by testimony at the evidentiary hearing indicating that defendant knowingly participated in the charged conspiracy.

### III. Conclusions of Law

#### A. Scope of Attributable Criminal Activity

19. As a threshold matter, the court must determine what conduct is attributable to defendant for the purpose of determining the guideline range. The sentencing guidelines provide that "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," sentencing adjustments are determined by considering "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(B) [hereinafter U.S.S.G.]. Application note 2 adds that jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy." *Id.* § 1B1.3 cmt. n.2.

20. The government initially sought to include losses attributable not only to the activities of First Atlantic but also to a conspiracy involving "more than a dozen other mortgage brokers." (ECF No. 41, at 2.) The government specifically pointed to former employees using the fraudulent techniques learned while working with defendant at First Atlantic at other mortgage broker companies. (*Id.*) The government asserted that under this line of reasoning "there can be no plausible argument that the damages is less than $7 million." (*Id.* at 3.)

21. Defendant objected to including losses attributable to mortgage brokers who were not associated with First Atlantic at all or were terminated from their positions with First Atlantic and no longer under defendant's supervision. (ECF No. 111, ¶¶ 74–76.) Defendant argued that there is no evidence he had knowledge of the number of other brokerage firms using Cowden's appraisals, the number of appraisals Cowden performed for those brokerage firms, or whether the appraisals prepared for the other firms "were fraudulent or inflated to the same degree as the appraisals" prepared for defendant. (*Id.* ¶ 75.) Accordingly, defendant argued that he cannot be held responsible for Cowden's conduct pursuant to U.S.S.G. § 1B1.3(a)(1)(B).

22. After the evidentiary hearing, the government backed away from its original position and asserted that defendant is responsible for the fraudulent activities of First Atlantic in conspiracy with Cowden. (*See* ECF No. 109.) The government's revised loss calculation is approximately $4 million. (*Id.* ¶ 75.)

23. Defendant maintains that he did not handle and had no knowledge of many of the loans that are included in the loss amount. (ECF No. 111, ¶ 71.) Defendant's proposed findings of fact and conclusions of law lacks clarity on this point, but the court infers that defendant is arguing he is only responsible for loans he personally brokered and not any loans brokered by other loan officers employed by First Atlantic.

24. From the testimony adduced at the hearing, the court concludes that defendant exercised managerial authority at First Atlantic. He trained loan officers, made most day-to-day decisions, and hired and fired employees. (ECF No. 102, at 170.) Defendant made the initial contact with Cowden and offered to paid more per appraisal to get priority service. (*Id.* at 42.) Cowden provided fraudulent appraisals to defendant and other loan officers at First Atlantic, but defendant managed Cowden's relationship with First Atlantic. (*Id.* at 50–52.) Defendant instructed other First Atlantic loan officers to make loan applicants appear to have more assets than was actually the case. (*Id.* at 102, 108.) The fees generated by the loans were split evenly between the loan officer and First Atlantic. (*Id.* at 94, 149, 170–71.) In light of this evidence, the court concludes that the defendant was a joint participant in the fraudulent activity of First Atlantic. Accordingly, the court will consider the conduct of First Atlantic employees in calculating the guideline enhancements attributable to defendant. *See United States v. Berger*, Crim. No. 09-308, 2012 WL 2402969, at *7–8 (W.D. Pa. June 26, 2012) (considering conduct of employees of defendant's mortgage brokerage firm and a closely related firm owned by defendant's sister in calculating loss).

25. Defendant's arguments that he cannot be held responsible for loans procured by other brokerage companies using fraudulent appraisals prepared by Cowden are

moot as the government no longer seeks to include these loans in the loss calculation. Similarly, the government no longer seeks to attribute to defendant the activities of former First Atlantic employees after they left defendant's company.

**B. Amount of Loss**

26. The parties dispute the amount of total loss to be determined for the enhancement under U.S.S.G § 2B1.1(b)(1). The government has the burden of establishing the amount of loss by a preponderance of the evidence. *United States v. Fumo*, 655 F.3d 288, 310 (3d Cir. 2011). Once the government makes out a prima facie case about the amount of loss, the burden of production shifts to the defendant to provide evidence showing that the government's evidence is "incomplete or inaccurate." *Id.* The ultimate burden of persuasion, however, remains with the government. *Id.* The court "need only make a reasonable estimate of the loss." *Id.*; U.S.S.G. § 2B1.1 cmt. n.3(C).

27. The government calculated losses in three categories—appraisal fees, broker fees, and losses to lenders—for a total loss amount of $4,016,540, which correlates to an eighteen-level enhancement. (ECF No. 109, ¶ 75.) Defendant argues that the government failed to meet its burden of proof to establish a reasonable estimate of the loss caused by defendant. (ECF No. 111, ¶ 72.)

*1. Appraisal Fees*

28. The government seeks to include in the loss calculation the amount borrowers paid to Cowden for appraisals that he was not licensed to make.

29. The application notes to the sentencing guidelines provide that where "services were fraudulently rendered to the victim by persons falsely posing as licensed professionals[,] … loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those services." U.S.S.G. § 2B1.1 cmt. n.3(F)(v).

30. Special Agent Fisher identified at least 133 fraudulent appraisals performed by Cowden for First Atlantic and paid for by borrowers in the total amount of

$51,600. (Ex. D.) In its briefing, the government argues that at least 113 borrowers paid for appraisals prepared by Cowden at a loss amount of $45,200. (ECF No. 109, ¶ 65.) The government appears to make a typographical error in this calculation, as it earlier noted that Special Agent Fisher determined that there were 133 fraudulent appraisals paid for by borrowers. (*Id.* ¶ 41.)

31. Defendant provided no evidence contradicting Special Agent Fisher's testimony regarding the appraisals prepared for First Atlantic by Cowden. Additionally, Cowden, Cupp, and Stanford all testified that defendant knew Cowden was preparing fraudulent appraisals. Although defendant notes that these witnesses were cooperating with the government, defendant adduced no evidence controverting their testimony. The court finds their testimony creditable. The loss due to fraudulent appraisal fees is $51,600 and is included in the loss amount.

### 2. *Broker Fees*

32. The government contends that fees paid by borrowers to First Atlantic should be included in the loss amount. The fees had two components. Borrowers directly paid First Atlantic a brokerage fee, which was included in closing costs. In addition, lenders would pay a premium to First Atlantic for selling borrowers an interest rate above the lowest the lender would offer, an amount known as "yield spread." These charges were legal as long as the total of the brokerage fee and yield spread was seven percent or less of the loan amount. There is no allegation that First Atlantic charged more than seven percent. The government argues that the brokerage fee and yield spread should be included in the loss amount under two theories.

33. The first theory is that First Atlantic advertised its business as getting borrowers the best interest rate possible for borrowers and concealed the facts that the rates borrowers paid were higher and that First Atlantic was paid part of that yield spread. According to the government, this conduct was fraudulent. (ECF No. 109, ¶¶ 69–70.) Cupp testified that First Atlantic told borrowers it would get

them the best rate possible. (ECF No. 102, at 190.) The government, however, offered no evidence of any exact statement or advertisement made by defendant or his company to borrowers or any reliance by borrowers on such a statement. Without this evidence, the court is unable to determine by a preponderance of the evidence that the conduct with respect to the rates was fraudulent, as it is just as likely either that First Atlantic's advertisements and brokers' statements were mere puffery or that the borrowers did not rely on those statements. Under these circumstances, the court is unable to include the amount of broker fees in the loss amount under this theory.

34. The government's second theory is that broker fees should be included in the loss amount because the fees were generated for loans based upon fraudulent appraisals. The loans never would have closed, and the fees never been paid, had First Atlantic submitted legitimate loan applications and appraisals to lenders. (ECF No. 109, ¶ 68.) This "but for" argument is correct. "A victim's loss will count against the defendant at sentencing if it would not have occurred but for the fraud." *United States v. Warner*, 338 F. App'x 245, 248 (3d Cir. 2009). In this context, "'but for the fraud' means 'had the defendant refrained from the conduct that gave rise to the fraud,' not 'had the defendant engaged in such conduct but did so lawfully (rather than fraudulently).'" *Id.* at 248 n.2 (citing *United States v. Needle*, 72 F.3d 1104, 1109–11 (3d Cir. 1996)). Although defendant and First Atlantic could have earned these fees legally, the fees paid to First Atlantic by borrowers are appropriately considered loss under U.S.S.G. § 2B1.1 because the loans closed due to fraudulently inflated appraisals.

35. Based on a review of HUD-1 forms, the government calculated that borrowers paid at least $966,262.21 in fees to First Atlantic. (Ex. F.) Defendant raised no arguments to this calculation. Accordingly, this amount will be included in the loss calculation.

### 3.  Lender Losses

36.  The government estimates that lenders suffered slightly more than $3 million in losses due to the default and foreclosure of loans fraudulently brokered by First Atlantic. (ECF No. 109, ¶ 71.) The government identified thirty-four such foreclosed properties. (Exs. E, E-1 to E-34.)

37.  Depending on the information available, the government used different methods for determining the amount owed to the lender at the time of foreclosure. For eighteen of the properties, the government was able to obtain a foreclosure complaint with the exact principal owed. (Ex. E.) When unable to determine the exact amount owed, the government estimated that amount by using the judgment amount, the original loan amount (from the HUD-1 form), or eighty percent of Cowden's appraisal value.

38.  For three properties (Exhibits E-14, -16, -19), the government used the judgment amount when the principal amount owed at foreclosure was unknown. The judgment amount contains fees and interest in addition to the principal balance. The application notes to the advisory guidelines specifically exclude interest, finance charges, late fees, and penalties from the loss calculation. U.S.S.G. § 2B1.1 cmt. n.3(D)(i). In another case, this court found the judgment amount to be a reasonable estimate of loss because the government did not include other expenses associated with foreclosure—such as closing costs, insurance payments, and management fees (*see* ECF No. 102, at 207)—in its loss calculation. *United States v. Berger*, Crim. No. 09-308, 2012 WL 2402969, at *18 (W.D. Pa. June 26, 2012) (finding that while judgment amount or demand amount was not a "particularly precise" method of estimating the unpaid principal balance, it was a reasonable estimate "since the government did not include in its loss calculations costs or expenses associated with the foreclosure process"). The original loan amounts for these properties, however, are less than

the judgment amounts.[3] This excess most likely represents fees and interest that should not be included in the amount of loss. The court therefore finds that, for these three properties, the original loan amount is a better estimate of the principal balance than the judgment amount and will use that amount instead.

39. Where the government did not know the exact principal at foreclosure or the judgment amount at foreclosure, it used the original loan value from the HUD-1 form. The government recognized that using the original loan amount "may slightly overstate the loss because the borrowers could have conceivably made small payments toward the principal." (ECF No. 109, ¶ 47.) The government argued, however, that this overstatement would be "de minimus" because at the beginning of a mortgage almost all payments are applied to interest, not principal. (*Id.*) Further, the government argued, any diminution of the principal amount would be less than the lender's costs of foreclosure that were not included in the government's calculation. (*Id.*) From the record evidence, the court cannot find that the overstatement is de minimus. For the seven properties at issue (Exhibits E-8, -9, -27, -28, -29, 30, -31), the length of time between the disbursement of the mortgage proceeds and the foreclosure sale ranged from a low of 22 months to a high of 113 months. After nine years, a homeowner could conceivably pay down more than a de minimus portion of the principal balance. Furthermore, the court was able to compare the principal at foreclosure to the original loan amount where both amounts were in the record. Although the court notes that for many properties the values were within ten percent, there are also outliers. For the property described in Exhibit E-2, the original loan amount was $55,000 and the principal due at foreclosure was sixty-seven percent of that, $36,749.22. The principal due on property described in Exhibit E-5 was eighty percent of the original loan amount. Because it is not known whether a particular property was an outlier or not, the court would need to speculate to

---

3    The difference between the original loan amounts and the judgment amounts is as follows: Exhibit E-14, $9,547.00; Exhibit E-16, $10,837.62; Exhibit E-19, $19,895.81.

reach the result sought by the government. Based on this record, the government did not meet its burden of proof with respect to properties where there was no evidence of a judgment amount and an original loan amount was used to estimate the principal due at foreclosure. Accordingly, these seven properties will not be included in the loss calculation.

40. The court finds that the eighty percent of appraised value method is not a reasonable estimate. Stanford and Cupp testified that eighty percent was a "typical" loan to appraised value ratio. (ECF No. 102, at 97, 157.) Cupp also testified, however, that for "a lot of borrowers" the ratio was seventy percent. (*Id.* at 187:1–8.) By comparing Cowden's rack sheet (Exhibit B) with Exhibit E, the court determined the actual ratio between appraised value and principal at foreclosure for nineteen properties (Exhibits E-1, -2, -3, -5, -7, -10, -13, -14, -15, -16, -17, -18, -19, -20, -21, -22, -23, -24, -30). The ratio ranged from a low of forty-six percent to a high of one hundred percent. With a variance this high, the court cannot make a reasonable estimate of the principal amount at foreclosure from the appraised value alone. Therefore, no loss will be included from the foreclosed properties where the government based the loss amount on eighty percent of Cowden's appraised value. (Exhibits E-6, -32, -33). *See Berger*, 2012 WL 2402969, at *18 ("[T]he 80% formula value is not a reasonable estimate unless there is evidence to indicate that the relevant loan was for the purchase of the property, rather than for a home equity loan.").

41. To the actual or estimated principal amount owed at foreclosure, the government added the foreclosure sales price, which is the amount the bank paid for the property at the sheriff's sale. From that total, the government subtracted the amount the property sold for after foreclosure to reach the loss amount. Where the property had not been sold, the government substituted the assessed tax value of the property. The use of assessed value was not challenged, and the court concludes that this is a reasonable method of calculating loss. *Berger*, 2012 WL 2402969, at *19.

42. Defendant objected to the government's methodology at the evidentiary hearing. Defendant argued that the government did not show a nexus between many of these loans and defendant or First Atlantic. (ECF No. 102, at 210.) Wikert, in preparing Exhibit E, only reviewed HUD-1 forms when a foreclosure complaint was not available, just nine of the thirty-four properties. (*Id.* at 230–31.) The foreclosure complaints themselves do not list the mortgage broker, and defendant's argument is well taken. In response to this objection, the government introduced HUD-1 forms for thirteen properties. (Exs. I–U.) A review of these forms indicates that First Atlantic was the broker for these loans.

43. The court concludes that where a HUD-1 form was reviewed in the preparation of Exhibit E or where a HUD-1 form was submitted to the court, the government has proven a nexus to First Atlantic and defendant. Where no such information was reviewed or provided, the only connection between the foreclosed property and First Atlantic is that Cowden performed an appraisal for First Atlantic, as noted on his rack sheet. First Atlantic might not have brokered a loan for every appraised property, and it is also possible that some borrowers took out subsequent home equity loans. The court concludes that where a HUD-1 was not reviewed, the government failed to prove sufficiently a nexus to defendant. Therefore, Exhibits E-3, -6, -7, -10, -17, -20, -21, -23, -25, -26, -32, and -33 will not be included in the lender loss calculation.

44. Defendant introduced Exhibits 6 and 7 to rebut, respectively, government Exhibits E-11 and E-15. After reviewing defense Exhibit 6, the court determined that it actually confirms the government's loss calculations in Exhibit E. Exhibit 7, however, indicates that for the property identified, the original mortgage brokered by First Atlantic was satisfied and a subsequent mortgage executed. The foreclosure losses calculated by the government for the property referenced in Exhibit E-15 resulted from this second mortgage, not the mortgage brokered by First Atlantic. Therefore, this loss will not be included in the lender loss calculation.

45. Based on the foregoing, the lender loss attributable to defendant is as follows.

| Property | Principal owed at foreclosure | Foreclosure sales price | Sales price after foreclosure | Loss |
|---|---|---|---|---|
| E-1 | $23,850.57 | $1,695.00 | $10,000.00 | $15,545.57 |
| E-2 | $36,749.22 | $5,700.00 | $31,000.00** | $11,449.22 |
| E-4 | $79,284.55 | $2,803.00 | $47,000.00 | $35,087.55 |
| E-5 | $89,799.09 | $9,000.00 | $9,000.00 | $89,799.09 |
| E-11 | $116,877.67 | $2,049.00 | $25,000.00 | $93,926.67 |
| E-12 | $126,000.00 | $1,010.00 | $38,000.00 | $89,010.00 |
| E-13 | $114,921.48 | $1,460.00 | $44,300.00 | $72,081.48 |
| E-14 | $110,000.00* | $1,319.00 | $80,900.00 | $30,419.00 |
| E-16 | $172,000.00* | $1,804.00 | $78,000.00 | $95,804.00 |
| E-18 | $160,763.55 | $1,454.00 | $74,000.00 | $88,217.55 |
| E-19 | $206,000.00* | $3,517.00 | $90,000.00 | $119,517.00 |
| E-22 | $223,760.94 | $1,593.00 | $173,900.00 | $51,453.94 |
| E-24 | $435,000.00 | $1,449.00 | $180,000.00 | $256,449.00 |
| E-34 | $103,551.36 | $2,678.00 | $36,000.00 | $70,229.36 |
| | | | total lender loss: | $1,118,989.43 |

\*   Original loan amount used in lieu of judgment amount.
\*\*  Assessed value used in lieu of sale price after foreclosure, because there was no evidence of a sale after foreclosure.

### 4. Total loss

46. Borrowers did not pay out of pocket for the appraisals and brokerage fees; rather, these closing costs were paid out of the loan proceeds and thus increased the principal amount owed. (ECF No. 102, at 96–98.) If these loans defaulted, the lender suffered the loss rather than the borrower. Therefore, loss would be double counted if appraisal and brokerage fee losses are calculated in addition to lender loss. In calculating the total loss, the court will deduct the appraisal fee and brokerage fee losses for the fourteen properties for which the government has proved lender losses.

| Property | Brokerage fee | Appraisal fee |
|----------|---------------|---------------|
| E-1 | $1,095.00 | $400.00 |
| E-2 | $2,750.00 | — |
| E-4 | $4,975.00 | $400.00 |
| E-5 | — | — |
| E-11 | $2,356.12 | $400.00 |
| E-12 | $5,794.90 | $400.00 |
| E-13 | $5,070.25 | — |
| E-14 | $1,330.00 | $400.00 |
| E-16 | $10,295.00 | $400.00 |
| E-18 | $2,207.50 | $400.00 |
| E-19 | $10,295.00 | $400.00 |
| E-22 | $13,645.00 | $400.00 |
| E-24 | $19,439.05 | $400.00 |
| E-34 | $4,183.75 | $400.00 |
| totals | $83,436.57 | $4,400.00 |

47. To avoid double counting, brokerage fee loss is reduced from $966,262.21 to $882,825.64 and appraisal fee loss is reduced from $51,600 to $47,200.

48. Based upon the foregoing, appraisal fee loss is $47,200, brokerage fee loss is $882,825.64, and lender loss is $1,118,989.43. The total loss attributable to defendant is therefore $2,049,015.07. Because this amount is greater than $1,000,000 and less than $2,500,000, defendant's offense level shall be increased by sixteen levels. U.S.S.G. § 2B1.1(b)(1).

### C. Number of Victims Enhancement

49. The government seeks a four-level enhancement for an offense involving more than fifty victims pursuant to U.S.S.G. § 2B1.1(b)(2). (ECF No. 109, ¶ 66.) As noted above, 130 borrowers paid Cowden for appraisals he fraudulently conducted on behalf of First Atlantic. (ECF No. 120, at 194; Ex. D.) Accordingly, the four-level enhancement for an offense involving more than fifty victims applies.

20

### D. Sophisticated Means Enhancement

50. In its revised position with respect to sentencing factors, (ECF No. 73), the government seeks application of a two-level enhancement for the use of sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

51. Application note 8(B) defines "sophisticated means" as

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1 cmt. n.8(B). "'Application of the adjustment is proper when the conduct shows a greater level of planning or concealment than a typical fraud of its kind.'" *United States v. Fumo*, 655 F.3d 288, 315 (3d Cir. 2011) (quoting *United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011)). Other courts of appeals have stated that the enhancement only applies when "'the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense.'" *United States v. Sheneman*, 682 F.3d 623, 632 (7th Cir. 2012) (quoting *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009)).

52. The defendant's own conduct is not the only factor to be used in determining whether a conspiracy involved sophisticated means. The sophisticated means enhancement at § 2B1.1(b)(10)(C) refers to offense conduct generally, not the individual defendant's conduct. As noted above, the guidelines manual defines offense conduct for purposes of determining specific offense characteristics as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

53. Defendant argues that "the main participants in the fraudulent scheme at First Atlantic Financial were Kenneth Cowden who prepared the fraudulent

appraisals, and Dan Gillen who created fraudulent documents to support the loan application." (ECF No. 111, ¶ 78.) Although it is true that Cowden and Gillen created the fraudulent appraisals and fraudulent documents as part of the overall scheme, the evidence adduced at the hearing unequivocally indicated that defendant knew about the scheme and specifically asked Cowden and Gillen to engage in those activities.

54. Defendant knew that Cowden was not a licensed appraiser and that the appraisals were fraudulently inflated—he would write "Ken's world" on appraisals to indicate that they were "beyond reality." (ECF No. 102, at 165.) Cowden engaged in conduct to conceal his fraudulent appraisals. He would sign his appraisals with the name of a licensed appraiser, and defendant was aware of this practice. (*Id.* at 39.) Cowden periodically needed to change the name of the licensed appraiser to avoid detection by state licensing authorities. (*Id.* at 60–61.) Additionally, Cowden repeatedly changed the name of his appraisal company to avoid detection by lenders, and defendant also knew about this practice. (*Id.* at 41.)

55. Defendant was aware of Gillen's practice of falsifying documents to support fraudulent loan applications. Specifically, defendant instructed Gillen to "get [a borrower] assets," meaning to falsify the necessary documents to justify a particular applicant's stated savings. (*Id.* at 108.) Defendant also noted repeatedly that Gillen "had a criminal mind." (*Id.* at 169.)

56. Because defendant knew about and actively encouraged the conduct of creating false documents and producing fraudulently inflated appraisals, those instances of offense conduct were reasonably foreseeable and therefore attributable to defendant. U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Bishop-Oyedepo*, 480 F. App'x 431, 433–34 (7th Cir. 2012) (affirming application of sophisticated means enhancement where the overall mortgage fraud scheme was sophisticated and defendant participated in and knew of the full scheme, even if the defendant's

individual actions did not constitute sophisticated means when viewed in isolation).

57. Courts have applied the sophisticated means enhancement in similar mortgage fraud cases. *See United States v. Parker*, 468 F. App'x 183, 185 (3d Cir. 2012) (affirming application of sophisticated means enhancement where defendant concealed his mortgage fraud by using straw purchasers and shell companies); *United States v. Green*, 648 F.3d 569, 576–77 (7th Cir. 2011) (affirming application of sophisticated means enhancement where defendant's mortgage fraud scheme "lasted three years and involved numerous complex fraudulent transactions, the creation of fake documents, and the participation of nearly twenty individuals"); *United States v. Knox*, 624 F.3d 865 (7th Cir. 2010) (affirming application of sophisticated means enhancement where defendant lied to sellers and buyers and provided lenders with falsified loan applications and grossly inflated appraisals). This court applied the sophisticated means enhancement in a similar mortgage fraud case. *United States v. Berger*, No. 09-308 (W.D. Pa. Mar. 5, 2013) (ECF No. 107).

58. Based upon defendant's conduct and the conduct attributable to him under U.S.S.G. § 1B1.3(a)(1)(B), including a years-long fraudulent scheme and efforts to conceal the fraudulent activities, a two-level enhancement for an offense using sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) is appropriate.

### E. *Leadership Role Enhancement*

59. The government argues for a four-level enhancement for defendant's leadership role in the offense pursuant to U.S.S.G. § 3B1.1(a). Section 3B1.1(a) provides that defendant's offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The

government initially sought, and the probation office applied, a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) in the PIR.[4] (ECF No. 36, ¶ 15.)

60. Application note 4 to § 3B1.1 requires the court to consider several factors in determining whether the enhancement should apply, including

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. Courts do not require that all the factors in the application note be present for the four-level enhancement to apply. *See United States v. Richards*, 198 F.3d 1029, 1033 (7th Cir. 2000). The Court of Appeals for the Third Circuit acknowledged that "the defendant's 'role in the offense' is the central criterion for application" of the enhancement. *United States v. Katora*, 981 F.2d 1398, 1404 (3d Cir. 1992).

61. Neither party disputes that there were at least five participants in the scheme engaged in by First Atlantic, including defendant, Cowden, Stanford, Gillen, and Cupp. Testimony at the hearing also indicated that defendant exercised significant day-to-day managerial control over the activities of First Atlantic, including dealing with the appraisers, engaging in hiring and firing, and making arrangements with lenders. (ECF No. 102, at 170.) The dispute primarily focuses on the degree of defendant's leadership and organization of the criminal conduct.

---

4   Section 3B1.1(c) is a catchall provision that provides for an increase by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1(c).

62. As indicated above, defendant was significantly involved in the illegal conduct at First Atlantic. Specifically, Cowden testified that defendant was a loan officer and that Cowden prepared appraisals for him. (*Id.* at 52.)

63. With respect to recruiting accomplices, defendant was the employee at First Atlantic who first approached Cowden and asked him to conduct appraisals for the brokerage firm, and he was the one to offer Cowden $400 for fraudulent appraisals in order to get priority. (*Id.* at 38–43.) Testimony revealed that defendant "managed" Cowden's relationship with First Atlantic. (*Id.* at 50–52.) Defendant also controlled which loan officers at First Atlantic worked with Cowden by acting as the primary go-between with Cowden in an effort to keep others in the office from "bother[ing]" him. (*Id.* at 51.) Cowden, by providing the fraudulently inflated appraisals, enabled the operation of the scheme. To the extent that defendant decided to hire and to work with Cowden—the lynchpin of the fraudulent activities—these facts implicate defendant's decision-making authority and role in planning and organizing the offense, all of which weigh in favor of finding that the enhancement applies.

64. With respect to the share of the fruits of the crime, testimony from several of the government's witnesses indicated that fees from the fraudulent activities were shared evenly between First Atlantic and the individual loan officer. (*Id.* at 94, 149, 170–71.) No testimony indicated that defendant claimed a "larger share of the fruits of the crime." U.S.S.G. § 3B1.1 cmt. n.4. This factor does not weigh in favor of finding that defendant was an organizer or leader.

65. Evidence adduced at the hearing reflected that defendant exercised differing degrees of control over the other members of the scheme. Defendant was certainly complicit in the fraudulent conduct, and was involved in training the employees, but Stanford testified that she never had a conversation with him explicitly about how to engage in fraudulent conduct. (ECF No. 102, at 124–30.) Cowden likewise testified that he could not recall ever having a conversation

with defendant about the fraudulent appraisals Cowden prepared or his unlicensed status. (*Id.* at 80–82.)

66. Other testimony, however, shows defendant's influence over the other conspirators with respect to the illegal conduct. Stanford related an instance in which she was preparing a loan for a waitress, and defendant instructed Stanford to "make [the waitress] the manager" in an effort to justify the assertion that the waitress was making $6,000 per month. (*Id.* at 102.) Stanford also testified that defendant instructed Gillen to "get [a loan applicant] assets," meaning to falsify documents in an effort to make it appear as though the applicant had more savings than she actually did. (*Id.* at 108.) Cupp offered testimony indicating defendant's degree of control. Specifically, when Cupp had an argument with Parise's assistant, defendant instructed Cupp to "stay away from … anybody that had any doings with the appraisal process." (*Id.* at 159.) These instances all indicate defendant's significant leadership and control over the employees at First Atlantic with respect to the offense conduct.

67. Defendant argues, without citation to authority or evidence, that "the evidence has demonstrated that the employees were free to leave the company if they did not agree with what the Defendant asked them to do," that First Atlantic "was registered in [defendant's] mother's name[,] and that she was responsible for paying the employees." (ECF No. 111, at 16.) These arguments do not relate to the overarching requirement that defendant organize or lead the criminal activity in question. U.S.S.G. § 3B1.1(a) (providing for enhancement "[i]f the defendant was an organizer or leader *of a criminal activity*" (emphasis added)). Defendant appears to argue that the enhancement would only apply if a defendant had such control over employees as to be able to prevent them from leaving their job. Defendant does not support this argument with any legal precedent, and, indeed, such control appears to contradict the notion of at-will employment.

68. The argument with respect to defendant's mother is equally unavailing. Testimony indicated that defendant was a part owner of First Atlantic, (ECF No. 102, at 176), and that he played a significant role in the day-to-day operations of the business. Although defendant did not pay the employees, he was the boss at First Atlantic and played the central role in directing and controlling the fraudulent activities of the other conspirators. *See Katora*, 981 F.2d at 1404 (defendant's "role in the offense" is the primary consideration with respect to the enhancement's applicability).

69. Taken together, the facts adduced at the hearing support a finding that the four-level enhancement in § 3B1.1(a) should apply. Defendant initiated the working relationship with Cowden and acted as Cowden's primary contact with First Atlantic. Defendant gave instructions to his coconspirators about how to engage in fraudulent activity, and defendant was in charge at First Atlantic with respect to the day-to-day operations, including hiring and firing. Although defendant did not command the "larger share of the fruits of the crime," the other factors indicate that defendant played a significant leadership role at First Atlantic, and as such the enhancement will apply.

### F.  Obstruction of Justice Enhancement

70. The government seeks a two-level enhancement in defendant's offense level calculation for obstruction of justice pursuant to U.S.S.G. § 3C1.1 because defendant filed a false affidavit with the court asserting his actual innocence in an attempt to withdraw his guilty plea.

71. Section 3C1.1 provides,

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the … sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The application notes to § 3C1.1 identify "producing or attempting to produce a false … record during an official investigation or judicial proceeding" and "providing materially false information to a judge" as conduct that falls within the scope of the enhancement. U.S.S.G. § 3C1.1 cmt. n.4(C), (F). The notes further define "material" evidence as "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6. The government bears the burden of proving the applicability of § 3C1.1 by a preponderance of the evidence. *United States v. Miller*, 527 F.3d 54, 60 n.5 (3d Cir. 2008).

72. In order to constitute "willful" obstruction of justice, the court must find that defendant had the specific intent to obstruct justice. *United States v. Hertzog*, 186 F. App'x 314, 318 (3d Cir. 2006) (citing *United States v. Hernandez*, 83 F.3d 582, 585 (2d Cir. 1996)). The application notes explain that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1 cmt. n.2 ("In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory . . . .").

73. Courts have applied the enhancement in § 3C1.1 in cases where the defendant sought to withdraw a guilty plea based upon a false affidavit or false testimony. *United States v. Ardolf*, 683 F.3d 894, 901 (8th Cir. 2012) (affirming application of two-level obstruction of justice enhancement where the defendant voluntarily admitted his guilt under oath at the change of plea hearing but later perjured himself by asserting his innocence); *United States v. Alvarado*, 615 F.3d 916, 923 (8th Cir. 2010) (affirming application two-level obstruction of justice enhancement where the defendant acknowledged his guilt and admitted a series of facts in support of that acknowledgement at the change of plea hearing, but later filed a sworn affidavit directly contradicting the admission); *United States v. Laano*, 58 F. App'x 859, 862 (2d Cir. 2003) (same).

74. Defendant in the present case filed a false affidavit in support of the motion to withdraw his guilty plea. Specifically, he swore "[t]hat [he] read the entirely [sic] of this motion and assert that each factual matter stated therein is true and correct to the best of [his] knowledge, information and belief," and asserted "that [he is] innocent of the offense charged in the indictment." (ECF No. 83-1, ¶¶ 2, 5.) The assertions made in defendant's affidavit in support of his motion (which was later withdrawn) are directly contradicted by defendant's admission of guilt at the change of plea hearing, his agreement with the government's evidence of his guilt at that hearing, and the testimony of the government's witnesses at the evidentiary hearing before this court. Since defendant's statements in the affidavit and his admission of guilt cannot both be true, and based upon the overwhelming record evidence of defendant's guilt, the court concludes that defendant willfully made a false statement, under oath, to the court in an attempt to avoid the consequences of his decision to plead guilty.

75. Defendant's false statements obstructed the judicial process by unnecessarily prolonging proceedings in his case by requiring the government to file an extensive response brief and requiring defendant to move for several continuances. Producing a false record during a judicial proceeding and providing "materially false" information to a judge is conduct that warrants an enhancement pursuant to § 3C1.1. U.S.S.G. § 3C1.1 cmt. n.4(C), (F).

76. In light of the substantial evidence supporting defendant's guilt—including his own admission during the plea colloquy—the court concludes that the obstruction of justice enhancement should apply. Defendant knew and acknowledged voluntarily that he committed the charged offense, yet he proceeded to contradict that acknowledgement in a false sworn statement to the court. That statement resulted in significant delay in the proceedings and substantial extra work for the government and the court. Defendant provided no evidence indicating that the false affidavit resulted from confusion, mistake, or faulty memory. As such, the two-level enhancement pursuant to § 3C1.1 applies in the present case.

### G. Acceptance of Responsibility

77. The government argues that defendant should not receive a two-level[5] reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a) for acceptance of responsibility in light of the false statements he made and his attempt to obstruct justice.

78. Section 3E1.1(a) provides for a two-level decrease in a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "Clearly demonstrating acceptance of responsibility requires a genuine show of contrition." *United States v. Muhammad*, 146 F.3d 161, 168 (3d Cir. 1998). The application notes acknowledge that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.1(A). The notes also indicate that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." *Id.* § 3E1.1 cmt. n.4.

79. When faced with the situation illustrated in application note 4, the Court of Appeals for the Eighth Circuit held that courts must look to the totality of the circumstances to determine whether a case is extraordinary such that both the obstruction of justice enhancement and the acceptance of responsibility reduction should apply. *United States v. Campos*, 362 F.3d 1013, 1016 (8th Cir. 2004) (citing *United States v. Honken*, 184 F.3d 961, 968-69 (8th Cir. 1999)); *see also United States v. Brown*, 80 F. App'x 794, 795 (3d Cir. 2003) (citing and applying the totality of the circumstances test set forth in *Honken* and

---

5     In the PIR, the Probation Office applied an additional one-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1(b) based on the timeliness of defendant's acceptance of responsibility and an offense level greater than sixteen. Defendant does not argue that this additional level should now apply.

acknowledging that courts should only apply the reduction in "extremely rare and highly exceptional" cases).

80. The test developed by the court in *Honken* is as follows:

> "To determine whether a case is 'extraordinary,' the district court should have taken into account the totality of the circumstances, including the nature of the [defendant's] obstructive conduct and the degree of [defendant's] acceptance of responsibility. Among other things, the district court should have considered whether, for example, the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution. It should have considered whether [defendant] voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement. The district court should have noted whether [defendant] admitted and recanted his obstructive conduct, or whether he denied obstruction of justice at sentencing. Moreover, in our opinion the district court should have also weighed not only whether the defendant pleaded guilty to the underlying offense but also whether he assisted in the investigation of his offense and the offenses of others."

*Campos*, 362 F.3d at 1016 (quoting *Honken*, 184 F.3d at 968–69).

81. Defendant bears the burden of proof with respect to establishing entitlement to a downward adjustment for acceptance of responsibility. *United States v. Bennett*, 161 F.3d 171, 197 (3d Cir. 1998).

82. Defendant in the present case offered no evidence to support his argument that "the offense level should be reduced by two (2) levels for the reason that the Defendant entered a Plea of Guilty and has demonstrated an acceptance of responsibility for his criminal conduct." (ECF No. 111, at 17.)

83. Defendant's conduct in the present case does not indicate that this is an "exceptional circumstance" in which the reduction for acceptance of responsibility should apply. Defendant's sworn affidavit denied his guilt for the offense, despite his earlier representation at the change of plea hearing that he was guilty of the offense. Defendant's obstructive conduct occurred long after

the investigation in this case, required the government to file a lengthy response, required the court to hold a hearing, and further delayed resolution of the proceedings. Defendant has not yet admitted his obstructive conduct to the court. The only mitigating factor in the present case is that defendant voluntarily withdrew his motion to withdraw his guilty plea; he only did so, however, after the court held a hearing on the motion and the government filed a brief (ECF No. 86) pointing out overwhelming evidence of defendant's culpable conduct. Absent any affirmative evidence of an acceptance of responsibility, the court concludes that the factors set forth in *Honken* weigh in favor of finding that defendant did not meet his burden of demonstrating that he accepted responsibility for his criminal conduct. The reduction in offense level in § 3E1.1 does not apply.

### H. Conclusion

84. Based upon the foregoing analysis and the sentencing guidelines, the court concludes as follows: (1) an sixteen-level enhancement for a loss greater than $1,000,000 applies under U.S.S.G. § 2B1.1(b)(1); (2) a four-level enhancement for an offense involving more than fifty victims applies under U.S.S.G. § 2B1.1(b)(2), (3) a two-level enhancement for an offense involving sophisticated means applies under U.S.S.G. § 2B1.1(b)(10)(C); (4) a four-level enhancement applies because defendant was the leader of a criminal activity involving five or more participants under U.S.S.G. § 3B1.1(a); (5) a two-level enhancement for obstruction of justice applies under U.S.S.G. § 3C1.1; and (6) no reduction in offense level for acceptance of responsibility applies under U.S.S.G. § 3E1.1. The court notes that defendant did not object to a two-level enhancement for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3.


Dated: November 26, 2013               /s/ Joy Flowers Conti
                                       Joy Flowers Conti
                                       Chief United States District Judge